**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

**UNITED STATES OF AMERICA**

          **v.**                                **MEMORANDUM**
                                                **AND ORDER**
**ALLISON M. HUNTE,**                        **04-M-0721(SMG)**

          **Defendant.**

-------------------------------------------------------X

**GOLD, S.,** *United States Magistrate Judge*:

## Introduction

The United States of America, acting on behalf of the government of Barbados, has requested the extradition of Allison Hunte pursuant to 18 U.S.C. § 3184 and the Extradition Treaty Between the Government of the United States of America and the Government of Barbados (the "Treaty"). Hunte faces charges in Barbados of trafficking in a controlled substance. I have conducted an extensive hearing addressed to whether the evidence presented by the Government of Barbados is sufficient to support extradition and whether Hunte has established any defense to extradition. Testimony was presented on March 14, April 5, April 20, May 27, and June 8, 2005, and closing arguments were presented on June 22, 2005. My findings and rulings are set forth in this Memorandum and Order.

## Background

On November 10, 2002, Barbados police arrested two men who were attempting to bring suitcases of marijuana into the country. The two men implicated three other individuals in connection with their drug trafficking. One of those individuals was Allison Hunte. Hunte was subsequently arrested and charged with trafficking in cannabis. In January of 2003, in violation of the bail conditions imposed upon her in Barbados, Hunte fled to New York, where she lived

and traveled under her own name until her arrest at John F. Kennedy Airport on June 7, 2004 on the Barbados extradition warrant.

Hunte opposes extradition on two grounds. First, she contends that the government has failed to establish probable cause to support the charges pending against her in Barbados, as the Treaty requires. Second, Hunte challenges her extradition on due process grounds by arguing that she entered into a cooperation agreement with the United States Drug Enforcement Agency ("DEA") which provided that she would not be extradited to Barbados. At an earlier stage in these proceedings, I considered whether Hunte should be afforded discovery on her due process claim. In that context, I held that an explicit promise by the United States government could be a valid defense to an extradition request. Docket Entry 29; United States v. Hunte, 2005 U.S. Dist. LEXIS 1209 (E.D.N.Y. Jan. 24, 2005).

## Discussion

### I. Scope of Extradition Hearing

As discussed in my prior Order, an extradition hearing is narrow in scope and should not be converted into a "dress rehearsal trial." Docket Entry 29 at 2; United States v. Hunte, 2005 U.S. Dist. LEXIS 1209 (E.D.N.Y. Jan. 24, 2005) (quoting Jhirad v. Ferrandina, 536 F.2d 478, 484 (2d Cir. 1976)); see also Melia v. United States, 667 F.2d 300, 302 (2d Cir. 1981) ("An extradition hearing is not the occasion for an adjudication of guilt or innocence. Rather, its purpose is to determine . . . whether there is sufficient evidence to justify extradition under the appropriate treaty."); In re Requested Extradition of McMullen, 1988 WL 70296, at *5 (S.D.N.Y. June 24, 1988); In re Sindona, 450 F. Supp. 672, 685 (S.D.N.Y. 1978) (holding that an accused may not offer contradictory evidence or evidence attacking credibility at an extradition hearing,

but may offer "explanatory" evidence negating a showing of probable cause). The limited purpose of an extradition hearing is to determine whether the requesting country has presented sufficient evidence to justify holding the defendant to answer the charges pending against her, and is not to determine whether or not the defendant is guilty of those charges. See Charlton v. Kelly, 229 U.S. 447, 460-61, 33 S.Ct. 945, 949 (1913). Nevertheless, in large part because of Hunte's unusual due process claim, I allowed her to present extensive evidence in support of her efforts to negate probable cause and to establish that she had been assured by government agents that she would not be extradited. Hunte presented eight witnesses, testified herself, and introduced more than fifty exhibits during the course of the hearing.

## II. Probable Cause

### A. *Treaty Provisions*

The Treaty provides for extradition upon a showing of probable cause that the requested individual has committed an extraditable offense. Treaty, Article 6, ¶ 3(c).[1] An extraditable offense is one punishable by both governments by at least one year of incarceration. Treaty, Article 2, ¶ 1. According to the Declaration of Haley D. Collums, an Attorney Advisor in the United States Department of State, the offense with which Hunte is charged in Barbados is punishable under the laws of the United States and Barbados by at least one year of incarceration. Government Exhibit ("GX") 1 at 3, ¶ 5. Hunte does not contend that there is any technical defect in the extradition request submitted by Barbados. Rather, her opposition to extradition rests upon her claims that the charges against her in Barbados are not supported by probable cause and

---

[1] The documents submitted by Barbados in support of extradition have been submitted as Government Exhibit 1. The Treaty is reproduced at pages 14-31.

that, before she fled from Barbados, agents of the United States government promised to protect her from extradition. I therefore turn my attention to the evidence submitted by Barbados in support of extradition and presented by the parties at the extradition hearing.

      B.     *Evidence Presented by the Government*

On November 10, 2002, police officers in Barbados arrested Alrick Johnson and Oneil Welds after searching their hotel room and finding several packages of marijuana. GX 1 at 59-61, 106-109. The police investigation of Johnson and Welds ultimately led to the arrest of Allison Hunte. The evidence against Hunte included statements made by Johnson, Welds, a customs officer named Robert Alleyne and a police clerk named Harry Agard, as well as Hunte's own apparently false exculpatory statements.

On the day he was arrested, Johnson made a signed, written post-arrest statement. GX 1 at 62-65, 72-79. In his statement, Johnson directly implicated Hunte, as well as a customs officer, Robert Alleyne, and a police department clerk, Harry Agard, in a drug smuggling conspiracy. Id. at 62-65. Specifically, Johnson stated, "I brought the drugs to Barbados for a woman in Barbados named Allison." Id. at 62. Johnson provided a detailed description of Hunte, which included a reference to a tattoo on Hunte's lower back. Id.

According to Johnson, Hunte asked him to smuggle marijuana to Barbados for her and paid him when he did so. Id. at 63. In furtherance of the drug smuggling conspiracy, Hunte and another individual told Johnson that one of the customs officers working at the airport in Barbados would assist in getting the drugs through customs when the code name "Ghetto Prince" was mentioned. Id. at 63-65. Johnson also described entering Barbados on November 9, 2002, presenting himself to the customs officer, using the code name "Ghetto Prince," and clearing

4

customs without his bags being searched.  Id. at 65.  Johnson provided the police with a detailed description of the customs officer.  Id. at 63.

According to Johnson, he had several telephone conversations with Hunte concerning drug smuggling prior to November 10, 2002.  Id. at 63-64.  Johnson also described being paid by Hunte on at least three separate occasions.  Id. at 63.  Johnson stated that he brought marijuana to Barbados for Hunte on July 8 and September 19, 2002, and was paid by Hunte, who wired money to him through Western Union from St. Lucia, upon his arrival in Barbados.  Id. at 63.  A review of immigration records confirmed that Johnson entered Barbados from Jamaica on July 8 and September 19, 2002.  Id. at 91.

It is not clear from Johnson's first post-arrest statement whether he met with Hunte in Barbados in July and September or just received a payment from her through Western Union.  Id. at 63-67.  However, in his first statement, Johnson did describe meeting with Hunte some time between October 3 and 10 of 2002 in Jamaica, and again at the Craft Market in Montego Bay, Jamaica on the morning of November 9, 2002.  Id. at 62-67.  Johnson also stated that Hunte was on the flight he and Welds took from Jamaica to Barbados, but got off the plane when it landed in Antigua.  Id. at 64.

Johnson gave a second statement to the police in Barbados on November 12, 2002.  Id. at 66-67.  In his second statement, Johnson stated that he first met Hunte some time after July 8, 2002, and not in May of that year as he had previously stated.  Johnson did not state how long after July 8, 2002 the meeting took place.  Id.  He also stated that, because he did not want to receive wired funds from Hunte in his own name, he arranged with Hunte that the funds would be sent in the name of his friend, Ferdie Hinds.  Id. While at the police station on November 12,

2002, Johnson correctly identified Hunte from a lineup.  <u>Id</u>. at 68-69, 138.  On the following day, Johnson identified the customs officer who responded to the code name "Ghetto Prince" from a lineup.  <u>Id</u>. at 70-71, 141.

Oneil Welds, who was arrested with Johnson in the hotel room on November 10, 2002, spoke to the police at the time of his arrest, but declined to give a written statement at that time. <u>Id</u>. at 109.  In his verbal statements, Welds stated that he brought marijuana into Barbados with Johnson, that Johnson directed him to present himself to a particular customs officer and use the code phrase "Ghetto Prince," and that Johnson told him they were bringing in the drugs for a woman named Allison.  <u>Id</u>.  The next day, Welds gave a written post-arrest statement.  <u>Id</u>. at 97-103.  In his statement, Welds again described how Johnson instructed him to present himself to a particular customs officer and to use the code phrase "Ghetto Prince."  <u>Id</u>. at 102.  Welds stated that, when he used the code name, the customs officer nodded, and that the officer did not look inside of his suitcases.  <u>Id</u>. at 102-03.  On November 13, 2002, Welds identified the customs officer from a lineup.  <u>Id</u>. at 104-05, 145.

Robert Alleyne, the corrupt customs officer, provided further corroboration of Johnson's statements.  During a search of Alleyne's home on November 13, 2002, police officers found three plastic bags and a carton containing currency.  <u>Id</u>. at 119-20.  At that time, Alleyne stated that some of the money came from traders who paid him to clear packages.  <u>Id</u>. at 121.  Alleyne was then asked to accompany the officers to the police station, where he was questioned.  <u>Id</u>. at 120-22.  Once at the station, Alleyne further stated that, although he had arrangements with several traders, he dealt with one in particular named Allison Hunte, and that he cleared shipments of garments for her.  <u>Id</u>. at 121.  Alleyne further acknowledged using the code name

"Ghetto Prince" and allowing Johnson and Welds to clear customs at the request of a man named

Harry Agard who works at a police station.  Id. at 121-22.

On November 14, 2002, the police executed a search warrant for the home of Harry

Agard.  Id. at 146-48.  Agard had been employed, like Alleyne, as a customs officer, but was later

transferred to police headquarters, where he worked as a clerical officer.  Id. at 90.  The officers

first found Agard at work at the police station and invited him to accompany them to his home.

Id. at 146.  In response to police questioning, Agard confessed, "I do some deals with Allison and

Robert and some Jamaicans with some drugs and garments and I would get the money to pay

Robert."  Id. at 147.  Agard later specified that Allison and Robert were Allison Hunte and

customs officer Robert Alleyne.  Id.

Finally, Hunte's own conduct when confronted by police provides further corroboration

of Johnson's statements.  Hunte was arrested and taken to a police station on November 12,

2002.  Id. at 109.  Hunte was questioned at the precinct in the presence of her attorney.  Id. at

110.  Despite Alleyne's statement that he dealt in particular with Hunte, Hunte at first denied

knowing a customs officer named Robert Alleyne or any other customs officers.  Id. at 110-11.

Hunte further denied ever calling a customs officer on her cell phone.  Id. at 111. Customs

Officer Alleyne was then brought into the area and identified Hunte as the person for whom he

had agreed to clear shipments of garments.  Id.  Hunte then acknowledged knowing Alleyne as

Bob and having his telephone number saved in her cell phone's memory because she called him

once after an airport Redcap had used her phone to call Alleyne.  Id.

C.    *Evidence Presented by Hunte*

During the extradition hearing, Hunte attempted to negate the government's showing of

probable cause in three ways: 1) by offering evidence which she claims contradicts some of Johnson's statements; 2) by offering affidavits from Johnson recanting his incriminating statements about Hunte and from Agard asserting that Hunte was not involved in his drug smuggling activities; and 3) by suggesting that Johnson had a motive to implicate Hunte falsely.

*1) Documents Tending to Contradict Johnson's Statements*

Hunte presented testimony and documentary evidence of her whereabouts at or about the times Johnson claimed to have met with her in an effort to show that she was elsewhere at those times. See Defendant's Post-Hearing Memorandum of Law, Docket Entry 47 ("Def. Mem.") at 12-13; Tr. of Mar. 14, 2005, at 29-171. As noted above, Johnson told police officials that he first met Hunte in Barbados some time after July 8, 2002, but did not specify how long after July 8, 2002 the meeting took place. GX 1 at 66. In an effort to contradict Johnson's statement, Hunte presented evidence that she was in the Bahamas, Miami, and then New York in early to mid-July. Def. Ex. A-1, E, V, NN, HHH; Mar. 14, 2005 Tr. 64-79 and 95-104. By her own admission, however, Hunte returned to Barbados on July 15, 2002, and thus could have met with Johnson on or after that date. Def. Ex. HHH.

Johnson also told police officers that he met with Hunte some time between October 3 and 10, 2002, in Jamaica. GX 1 at 63. In an effort to undermine this statement, Hunte presented evidence that she was in St. Vincent from October 4 to 6, 2002. Def. Ex. JJ, HHH; Mar. 14, 2005 Tr. 141-43. Obviously, this evidence does not preclude a meeting in Jamaica on or about October 3 or between October 7 and on or about October 10, 2002.

Finally, Johnson claimed in his post-arrest statement that he met Hunte at the Craft Market in Montego Bay, Jamaica at about ten o'clock in the morning on November 9, 2002. GX

1 at 64-65.  Hunte points out that she could not have met with Johnson in Montego Bay at about 10:00 a.m. because she took a flight that morning from Kingston, Jamaica to Montego Bay which did not arrive until 11:04 in the morning.  Def. Ex. CC.  Hunte further contends that she remained at the airport in Montego Bay and fell asleep while waiting for her flight out of Jamaica.  Tr. of April 20, 2005, at 98-99.  Hunte's flight did not depart from Montego Bay until shortly after two o'clock in the afternoon.  Def. Ex. CC.  Although the documents Hunte presented do appear to refute Johnson's statement that he met with her in Montego Bay at about ten o'clock in the morning, there is no persuasive, specific evidence in the record about whether the approximately three hours between the time Hunte arrived in Montego Bay and the time she left afforded her enough time to meet with Johnson somewhat later than he reported.  Moreover, the record indicates that Johnson recalled other events of November 9 occurring earlier than they did; although as noted above the flight Johnson and Hunte took from Jamaica left after two o'clock in the afternoon, Johnson told the police after his arrest that his flight left Jamaica at about one o'clock.  GX 1 at 64.

Hunte next contends that Johnson's statements that Hunte wired money from St. Lucia via Western Union to his friend, Ferdie Hinds, on or shortly after July 8 and September 19, 2002 is contradicted by records Hunte obtained from Western Union.  GX 1 at 63, 66.  Hunte presented documents which appear to indicate that there were no transfers of funds from St. Lucia through Western Union to Johnson or Hinds between July 1 and November 10, 2002.  Def. Ex. X.

2)  *Johnson and Agard Affidavits*

Hunte has submitted two affidavits of Alrick Johnson recanting his statements to the

9

Barbados police implicating Hunte in the drug conspiracy. Def. Ex. M and N. In the first affidavit, dated December 8, 2004, more than two years after his arrest, Johnson states "absolutely and categorically" that Hunte "was not involved in anyway [sic] with regard to my crimes, and that she is absolutely innocent of any such charges." Def. Ex. M, ¶ 5. Johnson goes on to state that he decided to make statements incriminating Hunte when he saw her on his flight because she was a "well-known personality in the Carribean music scene" and he thought he could reduce his punishment by blaming her. Id. at ¶¶ 2-3. Johnson also states that he "stuck to my story (until very recently), even though it was not true" in order "to obtain the benefits of cooperation." Id. at ¶ 4.

In a second affidavit dated March 14, 2005, Johnson reaffirms his prior affidavit and provides additional details. Def. Ex. N. Johnson states in this second affidavit that he never imported drugs for Hunte and was never paid by her. Def. Ex. N at ¶ 4. He further asserts that Hunte never gave him information about customs officers or secret code names. Id. at ¶ 5. Johnson states that he told Welds to name Allison as the person they were working for while they were being held in the same cell at the police station. Id. at ¶ 11. Finally, Johnson states that he implicated Hunte because he wanted to help himself, presumably by cooperating, and because the men he was actually working for were dangerous. Id. at ¶ 10.

Hunte has also submitted an affidavit of Harry Agard dated March 31, 2005. Def. Ex. O. As noted above, Agard stated after he was arrested that "I do some deals with Allison and Robert and some Jamaicans with some drugs and garments and I would get the money to pay Robert." GX 1 at 147. In his affidavit, Agard states that Hunte was not involved in drug smuggling and that his post-arrest statement about Hunte was meant to refer only to the assistance he gave to

Hunte in connection with clearing shipments of garments through customs. Def. Ex. O, ¶ 6.

All three of these affidavits were obtained by Andrew Pilgrim, the attorney who represented Hunte in Barbados in connection with the drug trafficking charges which are the basis of the pending extradition request. Apparently, Pilgrim also represents Agard in connection with the charges pending against him, and represented Johnson at his sentencing on the charges arising from this same case as well.

D.    *Discussion*

Probable cause is determined by examining the "totality-of-the-circumstances." Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332 (1983). Generally, an accomplice's incriminating statements, if corroborated, are sufficient to establish probable cause. United States v. Ceballos, 812 F.2d 42, 50 (2d Cir. 1987). In extradition proceedings in particular, "courts have consistently held that accomplice testimony, whether corroborated or not, is competent evidence to support a finding of probable cause." In re Extradition of Vukcevic, 1995 WL 675493, at *7 (S.D.N.Y. Nov. 14, 1995) (citations omitted). See also, Eain v. Wilkes, 641 F.2d 504, 510 (7th Cir. 1981); Ahmad v. Wigen, 726 F. Supp. 389, 400 (E.D.N.Y. 1989); In re Extradition of Atta, 1988 WL 66866, at *5 (E.D.N.Y. June 17, 1988); In re Extradition of Tang Yee-Chun, 674 F. Supp. 1058, 1062 (S.D.N.Y. 1987).

Evidence submitted in support of an extradition request is deemed truthful and its credibility generally may not be challenged at an extradition hearing. Vukcevic, 1995 WL 675493, at *7; Ahmad, 726 F. Supp. at 399-400. The function of a magistrate judge reviewing an extradition request "is to determine if there is 'any' evidence sufficient to establish . . . probable cause." Shapiro v. Ferrandina, 478 F.2d 894, 905 (2d Cir. 1973). Thus, a defendant

challenging extradition is limited to evidence which explains or obliterates, rather than contradicts, the government's proof.  Id.  Moreover, "[t]he extent of such explanatory evidence to be received is largely in the discretion of the judge ruling on the extradition request."  Sindona, 450 F. Supp. at 685.  Evidence which raises questions of credibility "should properly await trial."  Shapiro, 478 F.2d at 905; see also Sindona, 450 F. Supp. at 687.

In this case, Alrick Johnson states that Allison Hunte paid him to smuggle marijuana into Barbados.  As set forth in detail above, Johnson's statements are corroborated in several respects.  For example, Johnson's immigration records confirm that he entered Barbados on the dates he described.  Johnson's co-defendant, Welds, stated to police officers that he learned from Johnson that the person for whom they were smuggling drugs into Barbados was named Allison.  Customs Officer Alleyne confirmed that, as Johnson had stated, he cleared Johnson and Welds because they used the code name "Ghetto Prince."  Alleyne further corroborated Johnson and Welds by acknowledging having been paid off by Hunte, albeit only with respect to clearing shipments containing garments and not drugs.  Agard further confirmed Johnson's statements by acknowledging having done "deals" involving drugs and garments with "Jamaicans," Alleyne and Hunte.

Hunte's own post-arrest conduct is particularly telling.  Hunte, in what clearly seems to be a false exculpatory statement evidencing consciousness of guilt, at first denied knowing any customs officers.  Only when Alleyne identified her did Hunte admit to knowing him.  Hunte then attempted to explain that Alleyne's telephone number happened to be stored in her cell phone's memory only because an airport employee had borrowed her phone to call him.

Hunte argues that Johnson should not be believed because other evidence contradicts his

12

statements.  However, as discussed above, the evidence Hunte presented with respect to her whereabouts does not directly contradict the gist of Johnson's statements and is not appropriately considered in the context of an extradition hearing in any event.  Moreover, in light of the substantial corroboration of Johnson's statements described above, the absence of Western Union records is insufficient to defeat the government's probable cause showing.

Hunte further contends that Johnson's statements should be rejected because he had a motive to incriminate Hunte.  Although virtually every accomplice witness who incriminates others is motivated by self-interest, Johnson had little if any reason to implicate Hunte falsely.  It is undisputed that Johnson identified a corrupt customs officer and police department employee in his post-arrest statements.  Johnson's cooperation led to the arrests of Alleyne and Agard and the seizure of a substantial amount of criminal proceeds from Alleyne's residence.  It is hard to imagine that Johnson felt that this information would be insufficient to obtain the benefits of cooperation, or that he would put the value of his truthful cooperation against two government officials at risk by falsely accusing a music and clothing industry "personality" to make himself seem more attractive as an informant to the police.

The Johnson and Agard affidavits submitted by Hunte also fail to undermine the government's demonstration of probable cause.  Courts are divided over whether recantation evidence is properly received in an extradition proceeding.  A number of courts have admitted recantations with sufficient indicia of reliability, such as a recantation made during the course of a court proceeding or made against the interests of the individual recanting, where the recantations obliterate probable cause.  See In re Extradition of Strunk, 293 F. Supp. 2d 1117, 1126 (E.D. Cal. 2003) (admitting a recantation made at a videotaped hearing that obliterated a

weak probable cause showing); In re Extradition of Singh, 170 F. Supp. 2d 982, 1018-19 (E.D. Cal. 2001) (recognizing that recantations made under oath in open court are more reliable than statements obtained by counsel); Sandhu v. Burke, 2000 WL 191707, at *15-16 (S.D.N.Y. Feb. 10, 2000) (acknowledging that courts have considered recantation evidence which tends to obliterate probable cause); Maguna-Celaya v. Haro, 19 F. Supp. 2d 1337, 1343-44 (S.D. Fla. 1998) (holding that recantations would be considered because they were reliable and negated probable cause); In re Extradition of Contreras, 800 F. Supp. 1462, 1468-69 (S.D. Tex. 1992) (finding that recantations by all eleven co-defendants during a court proceeding were sufficiently reliable to obliterate probable cause); Republic of France v. Moghadam, 617 F. Supp. 777, 783 (N.D. Cal. 1985) (admitting recantation made against declarant's interest as more reliable than original statements). In Strunk, the court noted that "[w]here the *only* evidence to support probable cause is the unrecanted confession, courts have admitted the recantation as obliterating probable cause." 293 F. Supp. 2d at 1126 (emphasis added).

However, courts have been reluctant to consider recantation evidence where "the credibility of [the witness's] recantation cannot be determined without a trial." Singh, 170 F. Supp. 2d at 1024, aff'd by Barapind v. Enomoto, 400 F.3d 744, 749 (9th Cir. 2005). See also Hoxha v. Levi, 371 F. Supp. 2d 651, 658 n.2 (E.D. Pa. 2005) (finding that "the recantations raise credibility issues best left to the Albanian judicial system"); Orellana v. Parks, 2003 WL 1960268, *7 (S.D.N.Y. Mar. 25, 2003) (giving no weight to a recantation as it was outside the scope of admissible evidence in an extradition proceeding); Abu Eain v. Adams, 529 F. Supp. 685, 691 (N.D. Ill. 1980) (refusing to admit recantation evidence). In Barapind, the Ninth Circuit affirmed the extradition court's finding of probable cause on some of the allegations made

against the defendant, recognizing that a witness's statement denying having made incriminating statements attributed to him by the police "constituted conflicting evidence, the credibility of which could not be assessed without a trial. . . . [E]xtradition courts 'do[] not weigh conflicting evidence' in making their probable cause determinations." 400 F.3d at 750 (citation omitted).

Where a prior incriminating statement bears greater indicia of reliability than a subsequent recantation, the recantation, if admitted, would fail to negate the existence of probable cause. Contreras, 800 F. Supp. at 1469. Those are the circumstances here. The present case is similar to Eain v. Wilkes, in which the Seventh Circuit excluded recantation evidence based on a finding that the recantations lacked reliability. 641 F.2d 504 (7th Cir. 1981). In Eain, the original inculpating statements were sworn to before a judge. Id. at 511. Subsequently, as here, the recantations "were made to private counsel while [the witnesses] were being held in prison." Id. The Seventh Circuit affirmed the magistrate judge's decision that the alleged recantations were more properly considered at a trial in the requesting country than at an extradition hearing. Id. at 511-12.

The recantation evidence presented by Hunte is particularly unreliable. The Johnson and Agard recantations have been put before the court by means of affidavits, providing the government no opportunity to question the witnesses or otherwise test the reliability of the recantations. In contrast, Agard and Johnson would presumably be available for questioning at a trial in Barbados, and that is where the credibility of their new affidavits should be tested.

Moreover, the circumstances under which the Johnson and Agard affidavits were obtained are extremely troubling. The affidavits were secured by Andrew Pilgrim, the attorney who is representing Hunte in the criminal case pending against her in Barbados. Tr. of Apr. 5,

15

2005, at 19. Pilgrim also represents Agard in connection with the related charges pending against him, and represented Johnson at his sentencing. Tr. of Apr. 5, 2005, at 28, 34-39. It thus appears that Pilgrim, in an attempt to assist one client, Hunte, obtained affidavits from his other clients, Johnson and Agard, which appear to be inconsistent with statements they made to the police and might well expose them to further criminal charges in Barbados.

As clients facing criminal charges, Agard and Johnson presumably put their trust in Pilgrim and relied upon him to protect their interests at a time when they were under great stress. Whether Agard and Johnson allowed their relationship with Pilgrim to affect the substance of their affidavits is best determined at a proceeding where they are available for questioning.[2] Indeed, Pilgrim acknowledged in his testimony before this court that he has not advised the authorities in Barbados that Johnson has recanted his statements incriminating Hunte and that Agard claims that his statements incriminating Hunte were misunderstood. Tr. of Apr. 5, 2005, at 46-47. The Johnson and Agard affidavits, if believed, might well convince the authorities in Barbados to dismiss the charges against Hunte, and Pilgrim's failure to disclose them is therefore puzzling. Pilgrim's decision not to alert prosecutors in Barbados to the recantations and explanations of at least some of the witnesses against his client, Hunte, in a criminal case pending against her, thus suggests that the Johnson and Agard affidavits he secured for presentation to this court could not withstand scrutiny before a tribunal where Johnson and Agard

---

[2]Had Pilgrim undertaken the joint representation of Hunte, Agard and Johnson before this court, his conduct would undoubtedly be in violation of the New York Code of Professional Responsiblity. See EC 5-14, DR 5-105. See also ABA Model Rules of Prof. Conduct R. 1.7, cmt. 23 (2003) ("The potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than one co-defendant.").

are available as witnesses.  Having considered all of the circumstances under which they were made, I find that the Johnson and Agard affidavits lack sufficient reliability to overcome the government's probable cause showing.

Hunte argues that Alrick Johnson falsely accused her simply because she is a prominent personality who Johnson recognized as a fellow passenger on his flight from Jamaica.  Were that the case, Hunte's connections to Agard and Alleyne would be truly remarkable coincidences.  For that reason and all the other reasons stated above, I conclude that the drug smuggling charges pending against Hunte in Barbados are supported by probable cause and that the requirements of the Treaty are thus satisfied.

## III.  Protection from Extradition

In an alternative argument against extradition, Hunte contends that DEA agents proposed to her that she flee from Barbados to the United States and cooperate with them by providing information relevant to a pending narcotics investigation.  According to Hunte, the agents promised her that, in return, the United States would agree not to extradite her to Barbados.

In my prior Memorandum and Order, I determined that

> there is ample support for Hunte's position that, when a defendant
> relies upon a promise made by federal officials to her detriment, a
> defendant has a due process right to have that promise enforced,
> even when as a result an otherwise proper extradition request is
> denied or the United States is otherwise precluded from complying
> with its obligation pursuant to a treaty.

Docket Entry 29 at 8, United States v. Hunte, 2005 U.S. Dist. LEXIS 1209, at * 12 (E.D.N.Y. Jan. 24, 2005).  The parties agree that Hunte met with DEA agents in Barbados and discussed whether Hunte could provide useful cooperation.  The government denies, however, that DEA

agents encouraged Hunte to flee to the United States or promised her she would be protected from extradition if she did. The evidence presented by the parties at the extradition hearing in support of their respective versions of events is reviewed below.

A.    *Evidence Presented by Hunte*

Keith Walker was called as a witness by Hunte. Hunte and Walker knew each other because each was raised by the same guardian. Tr. of Apr. 5, 2005, at 62, 159. Walker, who had served in the United States military, knew two DEA agents working in Barbados and spoke with them from time to time about their work. Tr. of Apr. 5, 2005, at 60, 63. During these conversations, Walker learned that the agents were particularly interested in a target of a pending investigation who was referred to during the extradition hearing as ZZZ. Tr. of Apr. 5, 2005, at 64-65. Walker had seen Hunte and ZZZ together and had talked to Hunte about how she and ZZZ had come to know each other. Tr. of Apr. 5, 2005, at 65. After learning that Hunte had been arrested, Walker – with Hunte's connection to ZZZ in mind – offered to contact the DEA agents he knew on Hunte's behalf. Tr. of Apr. 5, 2005, at 68-69. Hunte agreed, and Walker arranged for Hunte to meet with DEA agents Gordon Patten and Carl Bell in November of 2002. Tr. of Apr. 5, 2005, at 81-82.

Hunte testified that her first meeting with the agents took place about one or two weeks after her arrest. Tr. of Apr. 5, 2005, at 161. Patten, Bell, Walker and Hunte were the only ones present. Tr. of Apr. 5, 2005, at 163. At the beginning of the meeting, Agent Patten asked Hunte to sign a waiver of rights form, but Hunte refused to sign the form without first having it reviewed by an attorney. Tr of Apr. 5, 2005, at 164. At about that time, Walker left the meeting. Tr. of Apr. 5, 2005, at 85-86. The agents then began to ask Hunte questions about ZZZ. Hunte

acknowledged that she was acquainted with ZZZ but denied knowing about any of his alleged criminal activities. Tr. of Apr. 5, 2005, at 165-67. The agents then asked Hunte if she would provide background information about ZZZ, such as who his associates were, what properties he owned, and where he used pay telephones, and Hunte agreed. Tr. of Apr. 5, 2005, at 167-68.

Hunte claims that, at this point in the meeting, Agent Patten told her that, "in exchange for my cooperation they would bring me to the U.S. and I would be protected and safe and I would never return to Barbados." Tr. of Apr. 5, 2005, at 168-69. Walker, who testified that he was present for this part of the meeting, corroborated Hunte's testimony and described Patten's statement in virtually identical terms: "Patten then told Allison if you cooperate with us, we will take you out of here back to the U.S. You don't have to worry about coming back to Barbados and you will be safe." Tr. of Apr. 5, 2005, at 83.

Hunte acknowledged, and Walker confirmed, that at the time Patten supposedly offered to take Hunte to the United States, Hunte had not expressed any desire to leave Barbados. Tr. of Apr. 5, 2005, at 117, 169; Tr. of Apr. 20, 2005, at 125. The "offer" was also made before the agents had any idea about what specific information or assistance Hunte could provide. Tr. of Apr. 5, 2005, at 117. Moreover, according to Walker, the agents stated that any actions they agreed to take would have to be approved by an attorney from the Department of Justice named Wendy Short. Tr. of Apr. 5, 2005, at 121. Walker could not be certain whether these statements were made during the meeting with Hunte or in a conversation he had with one of the agents afterward. Tr. of Apr. 5, 2005, at 121-125. In deposition testimony taken before the extradition hearing, Walker stated that Hunte told him after the meeting that Wendy would have to come to Barbados to "approve everything." Tr. of Apr. 5, 2005, at 125. At one point during the hearing,

however, Walker stated that his deposition testimony was incorrect, and that it was Patten who told him after the meeting that Wendy's approval would be required. Tr. of Apr. 5, 2005, at 122-25. In any event, Hunte testified that she felt "overwhelmed" by the offer and did not respond to it because she had never previously thought about leaving Barbados. Tr. of Apr. 5, 2005, at 169.

The agents asked to meet with Hunte again in the presence of her attorney, and a second meeting was arranged. Tr. of Apr. 5, 2005, at 170. Hunte brought Andrew Pilgrim – the attorney who, as discussed above, secured affidavits on Hunte's behalf from Alrick Johnson and Harry Agard – to the second meeting. Tr. of Apr. 5, 2005, at 171. By Hunte's own admission, there was no mention during this second meeting of her going to the United States or fleeing Barbados and never returning. Tr. of Apr. 5, 2005, at 172.

Hunte subsequently arranged to meet alone with Agent Bell at a bar. Tr. of Apr. 5, 2005, at 173. According to Hunte, she told Bell at this meeting that she "was willing to take his offer and cooperate with the DEA." Tr. of Apr. 5, 2005, at 173. Bell responded by telling Hunte that she would first need to sign a cooperation agreement in the presence of her attorney. Tr. of Apr. 5, 2005, at 173. When Hunte responded that she was concerned that any attorney in Barbados might feel obligated to report her plans to flee to Barbados officials, Bell agreed to discuss the matter further with Wendy Short. Tr. of Apr. 5, 2005, at 173-74.

Hunte testified that, some time later, she began to receive threatening telephone calls from ZZZ, who told Hunte he knew that she had been meeting with DEA agents. Tr. of Apr. 5, 2005, at 187. At or about the same time, in the early part of January, 2003, Bell told Hunte that he had spoken to Short, who said that the agents could assure Hunte's safety only if she came to the United States and that "they would deal with the cooperation agreement" once she arrived.

Tr. of Apr. 5, 2005, at 189. According to Hunte, Bell instructed her to find a way to get to St. Lucia, where he would meet her and arrange for her travel to the United States. Tr. of Apr. 5, 2005, at 193. However, weather conditions prevented Hunte from traveling on the date she and Bell had arranged, and Hunte ended up leaving Barbados with her brother on a fishing boat three days later. Tr. of Apr. 5, 2005, at 198-99.

Hunte called Agent Bell once she arrived in St. Lucia. Tr. of Apr. 5, 2005, at 200. Bell gave Hunte the telephone number of DEA Agent James Agee and told her to call Agee once she arrived in New York. Tr. of Apr. 5, 2005, at 200-01. Hunte did so and arranged to meet with Agee at a hotel bar. Tr. of Apr. 5, 2005, at 205-06. According to Hunte, Agee offered to advise her about whether to retain an attorney. Tr. of Apr. 5, 2005, at 206. Hunte also asked Agee whether she could travel abroad and Agee told her she could, but should avoid certain islands in the Caribbean. Tr. of Apr. 5, 2005, at 210.

Finally, George McCloud, a man Hunte began dating in 2003, testified at the hearing. Tr. of Mar. 14, 2005, at 175-77. McCloud stated that, about three weeks after he began seeing Hunte, she told him that she had been charged with drug trafficking in Barbados but that she was innocent of the charges. Tr. of Mar. 14, 2005, at 177. Hunte also told McCloud that she was cooperating with federal agents who would help keep her from being returned to Barbados. Tr. of Mar. 14, 2005, at 178.

On or about June 7, 2004, Hunte called McCloud and told him she had been arrested. Tr. of Mar. 14, 2005, at 186. Hunte asked McCloud to find a particular cell phone in which she had stored telephone numbers for Agee and Bell. Tr. of Mar. 14, 2005, at 186. Once he retrieved the cell phone, McCloud called Agee and told him Hunte had been arrested. Tr. of Mar. 14, 2005, at

190.  McCloud then told Agee that Hunte was upset because she had an agreement with the DEA which provided she would not be extradited.  Tr. of Mar. 14, 2005, at 190.  Agee responded that he was not present when any agreement was made and suggested that McCloud speak to Bell.  Tr. of Mar. 14, 2005, at 190-91.  Agee called McCloud again later and said that he had given Bell McCloud's telephone number and that Bell would call.  Tr. of Mar. 14, 2005, at 194-95.  However, McCloud never heard from Bell and, although he left several messages for Agee, never heard from Agee again either.  Tr. of Mar. 14, 2005, at 194-96.

Based upon her version of the conversations she had with Agents Patten and Bell, Hunte contends that the United States government encouraged her to flee from Barbados to the United States and promised her immunity from extradition once she arrived here.

### B.     Evidence Presented by the Government

Agents Patten and Bell testified at the extradition hearing.  Each denied ever suggesting to Hunte that she should flee to the United States or that they could or would protect her from extradition if she did.

Agent Bell, who has been a DEA Special Agent for fifteen years, was assigned to the agency's Barbados office from 2000 to 2003.  Tr. of May 27, 2005, at 219-21.  Bell acknowledged that ZZZ was the subject of a pending investigation which was stagnant in late 2002.  Tr. of May 27, 2005, at 225-26.  Bell read about Hunte's arrest in the newspaper and recognized her as someone believed by the DEA to be associated with ZZZ.  Tr. of May 27, 2005, at 227-29.  Shortly thereafter, Agent Patten received a telephone call from Keith Walker, who had called Patten from time to time in the past with information about drug trafficking.  Tr. of June 8, 2005, at 12-13.  Walker asked if Patten and his colleagues would be interested in

speaking to Hunte, and Patten responded that they would. Tr. of June 8, 2005, at 14. A meeting

was ultimately arranged and took place approximately three or four weeks after Hunte's arrest.

Tr. of June 8, 2005, at 15; Tr. of May 27, 2005, at 230. Agents Patten and Bell both testified that

the first two meetings were preliminary ones, held simply to determine whether Hunte might

have useful information about ZZZ.[3] Tr. of May 27, 2005, 231-37; Tr. of June 8, 2005, at 16-24.

Both recalled that Hunte was presented with a waiver of rights form during the meeting Walker

attended, but that she refused to sign it. Tr. of May 27, 2005, at 238; Tr. of June 8, 2005, at 17.

Most importantly, both flatly denied making any specific offer to Hunte or entering into any type

of agreement with her, much less encouraging Hunte to flee or promising to protect her from

extradition if she came to the United States. Tr. of May 27, 2005, at 232, 234, 238, 249-50, 256-

58; Tr. of June 8, 2005, at 20, 23-24, 36-37, 122. Bell did acknowledge telling Hunte that, if she

cooperated, the DEA would do what they could to protect her. Tr. of May 27, 2005, at 238. Bell

also told Hunte that, if her cooperation turned out to be productive, attorneys from the United

States Justice Department would inform the proper officials in Barbados about Hunte's

cooperation and seek lenient treatment on her behalf. Tr. of May 27, 2005, at 268.

According to Bell, Hunte called him frequently after their second meeting. Tr. of May

27, 2005, at 240. Bell also had at least two more meetings with Hunte at a hotel bar. Tr. of May

27, 2005, at 243-46. During these subsequent meetings, Hunte complained that her inability to

leave Barbados because of her bail conditions was interfering with her music and clothing

---

[3]Bell testified that Pilgrim, Hunte's attorney, attended the first meeting, and that Walker was present for the second. Patten, like Hunte and Walker, remembers Walker attending the first meeting and Pilgrim accompanying Hunte to the second. Tr. of May 27, 2005, at 231-32, 235-36; Tr. of June 8, 2005, at 16, 22.

businesses.  Tr. of May 27, 2005, at 244, 246.  At one point, Hunte told Bell that her lawyer had suggested she just leave.  Tr. of May 27, 2005, at 247.  According to Bell, the meetings were brief and nothing else of substance occurred.  Tr. of May 27, 2005, at 245, 247-50.

Bell testified that he first learned that Hunte had left Barbados when she called him from New York and told him she had fled with ZZZ's assistance.  Tr. of May 27, 2005, at 250-51. Because Hunte continued to express interest in cooperating, Bell suggested she contact DEA Special Agent James Agee, who had worked in Barbados in the past but was now stationed in New York.  Tr. of May 27, 2005, at 251.  According to Bell, he did not alert the authorities in Barbados or attorneys at the United States Department of Justice that Hunte had fled or that he had put her in contact with an agent in New York.  Tr. of May 27, 2005, at 252-53.

The government also called DEA Special Agent James Agee and Assistant U.S. Attorney Wendy Short as witnesses.  Agee testified that he was assigned by DEA to work in its Barbados office from 1997 until the first week of November, 2002, when he was transferred to New York. Tr. of May 27, 2005, at 104-05.  Although Agee knew of Allison Hunte as someone who was believed to be associated with ZZZ, he had not met or spoken to her when he left Barbados in November of 2002.  Tr. of May 27, 2005, at 110-11.

Some time after he was transferred to New York, Agee received a call from Agent Bell. Bell told Agee that Hunte was in New York and might have useful information about narcotics trafficking.  Tr. of May 27, 2005, at 112-13, 144.  Agee then received a call from Hunte and arranged to meet with her at a restaurant.  Tr. of May 27, 2005, at 115-16.  At the meeting, Agee asked Hunte about ZZZ, and Hunte replied that she knew ZZZ but had no information about his alleged involvement in drug trafficking.  Tr. of May 27, 2005, at 117-18.  At a second meeting,

held months later, Hunte told Agee that ZZZ had called her to see how she was doing but did not discuss anything specific, much less drug dealing, with her. Tr. of May 27, 2005, at 119-21. In addition to these two meetings, Agee had numerous telephone conversations with Hunte. Tr. of May 27, 2005, at 125. On at least one occasion, Hunte asked Agee whether it would be safe for her to travel out of the country. Tr. of May 27, 2005, at 123, 128. According to Agee, however, Hunte never provided useful information about ZZZ or narcotics trafficking generally. Tr. of May 27, 2005, at 126-28, 130-31, 134-35.

Assistant U.S. Attorney Wendy Short testified that she worked as a trial attorney in the Narcotics Division of the Department of Justice from 1998 to 2003 and was assigned to handle cases emanating from the Carribean. Tr. of May 27, 2005, at 10-12. Short recalled that DEA agents from Barbados called to tell her that a woman had been arrested on narcotics charges and was willing to talk to them. Tr. of May 27, 2005, at 15. The agents told Short they believed Hunte might have information about ZZZ, but did not explain to Short why they thought so. Tr. of May 27, 2005, at 16-17. Short advised the agents that she would speak to Hunte only through counsel. Tr. of May 27, 2005, at 16. When the agents told Short that Hunte did not want her lawyer to be aware of her communications with the DEA, Short instructed the agents not to have further substantive contact with her. Tr. of May 27, 2005, at 17, 24. Finally, Short testified that she never considered Hunte to be a cooperating witness and that no DEA agent had ever expressed any interest in having Hunte come to the United States or in entering into any kind of agreement with Hunte. Tr. of May 27, 2005, at 25-26.

C.    *Discussion*

Having considered the evidence presented by each side, I conclude that Hunte has failed

to establish that DEA agents arranged for her to flee from Barbados or that they promised her immunity from extradition. I reach this conclusion for several reasons.

First, Walker testified that the agents alerted him, either during the first meeting or shortly thereafter, that any agreement they made would have to be approved by Wendy Short. If the statement was made during the meeting, Hunte would have heard it, and would have known that the agents did not have the authority, on their own, to promise her protection from extradition. Even if the statement was made later, it seems logical to infer that Walker, who was so close to Hunte that he arranged a meeting with DEA agents to discuss ZZZ on her behalf, would have told Hunte about it. Yet neither Hunte nor Walker ever spoke to or met Short or obtained anything in writing from her.

Second, Hunte's explanation of the circumstances under which the agents purportedly made their "offer" makes little sense. At the time of the first meeting, Hunte had not expressed any interest in leaving Barbados and had not provided any significant incriminating information about ZZZ or any other alleged drug dealer. Indeed, Hunte never indicated she was aware of anyone's involvement in narcotics trafficking, and never made recorded telephone calls, arranged undercover meetings, or testified before a grand jury, at a trial, or in any other criminal proceeding. Even assuming for purposes of argument that the agents would have employed unauthorized tactics to obtain valuable information about ZZZ or other targets, it strains logic to believe that they would have jeopardized their careers by offering a benefit they had no authority to convey, and which had not even been requested, to a potential source of questionable value. Bell's version of events – that the agents told Hunte that, if she cooperated, they would do their best to protect her and have federal prosecutors inform the proper officials in Barbados of her

26

cooperation – is much more logical.

Agent Patten's conduct after Hunte left Barbados is also difficult to reconcile with Hunte's version of events. Patten testified that, at some point after he learned Hunte was in New York, he contacted law enforcement officials in Barbados to advise them that Hunte was in the United States, only to learn that the Barbados officials already had that information. Tr. of June 8, 2005, at 29-30. Patten then suggested to the officials certain steps they might take to increase the likelihood that Hunte would be apprehended. Tr. of June 8, 2005, at 30-32. It seems unlikely that Patten would encourage Barbados officials to pursue Hunte's arrest if, as Hunte argues, Patten had made an unauthorized promise to her of immunity from extradition.

It is also not credible that Hunte would have failed to obtain some written documentation confirming the extraordinary promises she contends were made by Patten and Bell to her, or at least to have consulted with an attorney about them. Hunte was a sophisticated businesswoman who ran a clothing boutique and acted as agent and manager on behalf of a performer with bookings around the world. Hunte frequently traveled to foreign countries in connection with her business interests. Moreover, as Hunte acknowledged, she refused to sign the waiver of rights form presented to her by the agents because she did not have an attorney with her at the time, demonstrating her understanding of the importance of obtaining legal advice regarding her dealings with the agents.

Hunte's sophistication, and her recognition of the importance of legal advice, was further demonstrated by her testimony in response to government questioning about why she did not discuss the purported DEA offer with her attorney, Pilgrim. Hunte testified that she inquired of various attorneys in Barbados and learned that a lawyer who became aware that a client facing

pending charges was planning to leave Barbados had a duty to report the client's impending flight. Tr. of Apr. 20, 2005, at 199. Hunte testified that she took care to frame her inquiry as a hypothetical question, apparently so as not to trigger a reporting obligation. Tr. of Apr. 20, 2005, at 199-200. For this reason, according to Hunte, she did not discuss the offer she contends the agents made to her with Pilgrim.

Even if Hunte reasonably decided not to discuss her plans to leave Barbados with Pilgrim, it is unlikely that, sophisticated as she was, she would have failed to consult an attorney in the United States before fleeing based upon an unwritten promise made by a government agent and confirmed in a hotel bar. Hunte clearly had the means to retain counsel. McCloud testified that Hunte was earning a substantial income and could easily have afforded to retain counsel at the time she fled, and that Hunte in fact retained an attorney once she came to New York to assist her in connection with her business activities. Tr. of Mar. 14, 2005, at 257-59. It is difficult to imagine that an individual with Hunte's level of sophistication, and with contacts in various countries and ample financial resources, would not engage an attorney from the United States to ensure that the promise she was relying upon was documented and enforceable.

Moreover, although it might seem odd that Hunte would flee Barbados and then live openly without some guarantee against extradition, she did have a compelling motive to do so. As discussed above, Agent Bell testified that, before she left Barbados, Hunte complained to him that her inability to travel abroad was hurting her clothing and entertainment businesses. Hunte's passports – one from Barbados and another from the United States – were received in evidence, and reveal extensive international travel during the months leading up to Hunte's arrest in Barbados on November 10, 2002. Def. Exs. S, T. Moreover, Hunte applied for a new passport

within a few days of arriving in the United States, traveled to Amsterdam less than a month later, and took several other trips abroad to countries including Canada, England, Jamaica, Spain and Germany during 2003 and 2004. Tr. of April 20, 2005, at 137-40, 152; Def. Exs. CCC, DDD. This evidence indicates that Hunte was, as Bell testified, eager to travel, but could not do so without violating the conditions of her bail in Barbados, and thus had a strong motive to flee. This evidence further indicates that Hunte was willing to travel to several countries, including Jamaica, whose governments had made her no promises and without any documentation from any representative of the United States indicating that she was not to be arrested or extradited to Barbados.

It is troubling that, as the evidence presented at the hearing indicates, neither Bell nor Agee alerted the authorities in Barbados after Hunte fled that she was living in New York and calling Agee regularly. Their failure to report Hunte's whereabouts to officials in Barbados, however, hardly demonstrates that Bell encouraged Hunte to flee and promised she would not be extradited.

It is even more disturbing that, as Hunte's counsel reported in a letter to the court dated October 31, 2005, Agent Agee entered a plea of guilty to a felony information on October 27, 2005. The information charges that, during the period from October 22, 2000 to September 16, 2002, while heading the DEA's Barbados office, Agee created false documents which inflated the amounts of government funds disbursed to various recipients. The information further charges that, as part of his scheme, Agee forged the signatures of local law enforcement officers and subordinate DEA officials. According to a Department of Justice press release, Agee stole approximately $10,000 to $30,000 in this manner.

Hunte argues that the principles announced in <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194 (1963) and its progeny suggest that the government's failure to disclose that Agee was the subject of a pending criminal investigation when he testified is in and of itself grounds to dismiss this action and deny Barbados' extradition request. This argument lacks merit. First, it is far from clear that <u>Brady</u> even applies in an extradition proceeding. <u>See</u> <u>Montemayor Seguy v. U.S.</u>, 329 F. Supp. 2d 883, 888 (S.D.Tex. 2004); <u>In re Extradition of Singh</u>, 123 F.R.D. 108, 112 (D.N.J. 1987). Second, there is no indication that the investigation was ongoing when Agee testified, or that the prosecutor who presented this case, others in his office, or any other government witness had any information about Agee's misconduct. <u>See</u> <u>United States v. Locascio</u>, 6 F.3d 924, 949 (2d Cir. 1993) (holding that there is no <u>Brady</u> violation where "there is no evidence that the prosecution team in the instant case was aware of the reports. . . . We will not infer the prosecutors' knowledge simply because some other government agents knew about the report."). Moreover, Agee's testimony was only marginally relevant; Hunte claims that it was Patten and Bell who encouraged her to flee and promised her she would not be returned to Barbados. Agee first became acquainted with Hunte only after she fled, and even Hunte does not describe any meetings or discussions with Agee at which the specific terms of her "agreement" were reviewed. Finally, the case cited by Hunte in support of her argument, <u>Kyles v. Whitley</u>, 514 U.S. 419, 115 S.Ct. 1555 (1995), is inapposite. In <u>Kyles</u>, as in most cases applying <u>Brady</u>, evidence favorable to the defense which should have been disclosed by the government prior to trial came to light only after a jury returned a guilty verdict. In this case, this court is the finder of fact, and I have been made aware of Agee's guilty plea before making my findings.

## Conclusion

For the reasons stated above, I find that there is probable cause to support the charges pending against Hunte in Barbados. I further find that Hunte has failed to establish any defense to extradition. Accordingly, the government shall prepare a Certificate of Extradition for execution by the Court.

**SO ORDERED.**

_____/s/_____
**STEVEN M. GOLD**
**United States Magistrate Judge**


**Brooklyn, New York**
**January 4, 2006**

*U:\Hunte010406.wpd*